

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-30-2001

# United States v. Mathis

Precedential or Non-Precedential:

Docket 99-5940

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. Mathis" (2001). *2001 Decisions.* Paper 200.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/200

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 30, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5940

UNITED STATES OF AMERICA
Appellee

v.

KEITH MATHIS
Appellant

On Appeal from the United States District Court
for the District of New Jersey
NO. 98-cr-656-2
District Judge: Honorable Alfred J. Lechner, Jr.

Argued June 1, 2000

Before: SCIRICA and NYGAARD, Circuit Judges and
POLLAK,* District Judge

(Filed: August 30, 2001)

---

* Honorable Louis H. Pollak, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

Robert J. Cleary, Esq.
George S. Leone, Esq.
Phillip H. Kwon, Esq. (argued)
United States Attorney
Assistant United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

Counsel for Appellee United States
of America

Mark A. Berman, Esq. (argued)
Peter J. Torcicollo, Esq.
Gibbons, Del Deo, Dolan,
Griffinger & Vecchione
One Riverfront Plaza
Newark, NJ 07102

Counsel for Appellant

OPINION OF THE COURT

POLLAK, District Judge:

This appeal concerns three challenges to Keith Mathis's conviction for bank robbery and conspiracy to commit bank robbery. First, Mr. Mathis claims that the District Court wrongly admitted into evidence testimony describing his involvement in previous, uncharged bank robberies. Second, Mr. Mathis asserts that the District Court erred in admitting evidence that his picture was selected from a photographic array, because the array was unconstitutionally suggestive. Third, Mr. Mathis argues that the District Court wrongly excluded expert testimony that called into question eyewitness testimony identifying Mr. Mathis as he fled from the robbery. As described herein, we disagree with Mr. Mathis's first and second arguments on their merits; with respect to the third, we hold that the District Court erred in part, but we find it highly improbable that such error affected the jury's decision. Thus, we affirm Mr. Mathis's conviction.

I. Background

On October 20, 1998, a grand jury indicted Mr. Mathis,
Steven Gantt, and Jeffrey Seaberry on one count of bank
robbery, in violation of 18 U.S.C. SS 2113(a) and 2, and one
count of conspiracy to commit bank robbery, in violation of
18 U.S.C. S 371. The indictment charged the three men
with conspiring, from October 11 to October 14, 1998, to
rob the Sun National Bank in Maple Shade, New Jersey,
and with successfully robbing that bank on October 14,
1998. Mr. Mathis pled not guilty to both counts, and his
trial commenced on January 19, 1999.

At Mr. Mathis's trial, two witnesses testified that they
saw, from an adjoining office building, three masked men
with guns run into, and then out of, Sun National Bank.
These witnesses testified that the three masked men drove
away in a dark-colored Jeep. Also, several Sun National
Bank employees testified that, when the three were inside
the bank, one stood near the door holding two guns, while
the other two jumped over the bank counter and took
money from tellers' drawers. Video footage taken by the
bank's security cameras confirmed the basic details of
these accounts.

The prosecution's primary witnesses were Sergeant Gary
Gubbei and one of Mr. Mathis's alleged co-conspirators, Mr.
Gantt. Sergeant Gubbei testified that, on the morning of
October 14, he responded to a radio dispatch describing the
robbery and the getaway vehicle. Soon thereafter, Sergeant
Gubbei spotted a black Jeep Cherokee with an African-
American driver in the opposing lane of traffic; Sergeant
Gubbei turned and gave chase. After a period of pursuit,
the Jeep left the highway and drove onto a grass median,
where the vehicle apparently stalled and coasted to a halt.
Three men exited the Jeep while it was still moving--the
driver first, then a forward passenger, then a rear
passenger--and escaped over a guardrail on the highway's
far side. The forward passenger, while stumbling over the
guardrail, dropped a black bag containing money. The rear
passenger carried a gun in his right hand as he exited the
Jeep and held the weapon near his head, pointing toward
the sky. The rear passenger momentarily looked back at
Sergeant Gubbei before running away, and Sergeant

3

Gubbei testified at trial that he was able, based on that brief view, to identify the fleeing man as Mr. Mathis. Sergeant Gubbei also testified that, at 1:00 p.m. on October 15, he selected Mr. Mathis's picture from an eight-picture photographic array as depicting one of the Jeep's occupants.

Mr. Gantt, who pled guilty in this case, testified that he and Mr. Mathis jointly robbed a total of twelve banks, including the Sun National Bank, and that seven of these robberies, including that of the Sun National Bank, also involved Mr. Seaberry. Mr. Gantt further testified that these seven robberies shared other characteristics: The robbers covered their faces with masks; the robbed banks were located near Camden, New Jersey; and Mr. Mathis often stood as an armed guard, while Mr. Gantt and Mr. Seaberry vaulted the counters and stole cash from the drawers.

In describing the Sun National Bank robbery, Mr. Gantt testified that Mr. Mathis, Mr. Seaberry, and he parked a Jeep at the rear of the bank's parking lot, donned face masks, ran alongside the bank, and entered through the front of the building. Mr. Gantt stated that he and Mr. Seaberry jumped over the tellers' counters and placed money from the drawers in a bag they were carrying, while Mr. Mathis stood guard with two pistols. The three then returned to the Jeep. Mr. Seaberry drove, Mr. Gantt rode in the forward passenger's seat, and Mr. Mathis rode in the rear passenger's seat. Mr. Gantt testified that, as the Jeep tried to evade a pursuing police cruiser (apparently driven by Sergeant Gubbei), Mr. Seaberry tried to drive over the highway's grass divider, causing the Jeep's engine to stall, and the three men exited while the vehicle was still rolling forward. Mr. Gantt stated that he and Mr. Mathis jumped over the highway guardrail and, without Mr. Seaberry, escaped after stealing a nearby delivery truck. At trial, Detective Jeff Hoch testified that he arrested Mr. Seaberry near an apartment complex beside the highway.

II. Grounds for Appeal

A. Evidence of Uncharged Robberies

At trial, the government moved in limine to admit into evidence testimony from Mr. Gantt concerning eleven

4

robberies that he and Mr. Mathis had jointly undertaken prior to the Sun National Bank robbery. The government first addressed the testimony's admissibility under Federal Rule of Evidence 404(b), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b). According to the government, the disputed evidence was admissible, inter alia, to show Mr. Mathis's familiarity with Mr. Gantt and Mr. Seaberry prior to the charged offense and to show the group's modus operandi for robbing banks. In response, Mr. Mathis conceded that Rule 404(b) was satisfied, but he claimed that Mr. Gantt's testimony presented a risk of unfair prejudice that substantially outweighed its probative value and was therefore barred by Rule 403, which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

The District Court admitted Mr. Gantt's testimony into evidence, holding, as a preliminary matter, that Rule 404(b) was satisfied because the testimony's description of uncharged acts was linked to charged conduct by "[t]he same general area, the same general time period, the intent entering into the conspiracy, the background of this, the familiarity [of] one with the other, the agreement among everyone and the knowledge with regard to how to carry out bank robberies." With respect to Rule 403, the District Court acknowledged that there was "prejudice in this evidence," but it also found that the evidence "possess[ed] great probative value." Mr. Mathis's defense was one of mistaken identity, and the District Court found that "[t]his

5

evidence from a co-defendant links him directly to the crime, directly with the evidence of the police officer who will testify. . . . I find it is not unfairly prejudicial looking at what the Government must prove, what is available to the Government and who is going to be offering the testimony." When Mr. Gantt completed his testimony regarding the uncharged robberies, the District Court read a jury instruction (whose substance is not challenged) limiting use of the testimony to showing "defendant's knowledge of the crime of bank robbery and . . . his familiarity with the other alleged co-conspirators" and to showing "that the robbery of Sun National Bank was part of a scheme or plan in which the defendant participated."  The District Court stressed that the jury could consider such evidence "only for [those] limited purposes . . . [and] to use the evidence for any other purpose would be improper and violative of your oath."

We review a district court's decision to admit or exclude evidence for abuse of discretion, and such discretion is construed especially broadly in the context of Rule 403. E.g., Hurley v. Atl. Police Dep't, 174 F.3d 95, 110 (3d Cir. 1999). On appeal, Mr. Mathis claims that Rule 403 should have barred the contested portion of Mr. Gantt's testimony because "evidence relating to so many other uncharged bank robberies" inevitably prejudiced the jury"by demonstrating that Mathis had a propensity to rob banks." Appellant's Br. at 28. He also claims that such testimony was not significantly probative because the government "could establish Mathis' identity, or his association to Gantt . . . by Sergeant Gubbei's eyewitness identification. . . and [by] Steven Gantt's testimony that he was acquainted with Mathis and that he . . . robbed the Sun National Bank with the defendant." Id. at 30.

With respect to the testimony's risk of prejudice, we agree with the District Court that the disputed testimony's description of eleven uncharged robberies, in a case seeking conviction on only one, entailed some risk of unfair prejudice. That is, the jury could well have interpreted Mr. Gantt's testimony as proving that Mr. Mathis was a person of bad character who deserved punishment independent of the government's particular proof regarding the Sun National Bank robbery. But in United States v. O'Leary, 739

6

F.2d 135 (3d Cir. 1984), this court held that the number of uncharged acts alleged, even if disproportionate to the number of charged acts, does not alone render admission of such evidence an abuse of discretion. The defendant in O'Leary was charged with one count of conspiracy to distribute cocaine and five counts of possession with intent to distribute cocaine. Mr. O'Leary claimed that the district court erroneously admitted testimony stating that he had sold drugs on "[a]bout 20" occasions during the course of "[a]bout a year." Id. at 136. We affirmed the conviction, finding that the district court had expressly analyzed the defendant's Rule 403 challenge and had issued an instruction "clearly explaining to the jury the narrow way in which to use the evidence," thereby "lessen[ing] any possibility of prejudice." Id. Similarly, in the case at bar, the District Court explicitly balanced the testimony's probative value against its danger of unfair prejudice, and it instructed the jury on the permissible uses of Mr. Gantt's testimony.1

The chief authority on which Mr. Mathis relies is United States v. Hans, 738 F.2d 88 (3d Cir. 1984), where we reversed a defendant's conviction for bank robbery and assault during the commission of a bank robbery. The testimony in Hans was from an FBI agent, and it described the surprising speed with which the defendant became a suspect in the case. Such testimony was deemed extremely prejudicial because, in context, "the only reasonable inference that a reasonable juror could draw from the testimony was that Hans was well-known as a bank robber

_____

1. Mr. Mathis seeks to distinguish O'Leary  because the witness in that case answered relatively few, relatively cursory questions about the defendant's previous misconduct, while "the government's examination of Gantt regarding the details of the eleven uncharged bank robberies went on for 34 pages, and dominated Gantt's trial testimony." Reply Br. at 26. We cannot agree that the government's efficiency, or lack thereof, in conducting Mr. Gantt's examination significantly determines the resultant testimony's prejudicial effect. Here, as in O'Leary, the government's questions were sufficient in duration and substance to raise the defendant's prior misconduct as an issue, and this fact alone--not any claim of "undue delay, waste of time, or needless presentation of cumulative evidence"--is the defendant's asserted basis for prejudice.

7

to the Detroit F.B.I." Id. at 94; id.  ("[I]t is difficult to imagine testimony more prejudicial than [the] implication that Hans was known to the Detroit police as a professional bank robber . . . ."). Mr. Mathis has presented no argument that Mr. Gantt's testimony implicated the unusual risk of prejudice discussed in Hans, and we see no reason to believe it did so. Whereas the testimony in Hans generated untestable inferences about what was "well-known" by the "Detroit F.B.I.," Mr. Gantt testified directly regarding his own experience. Thus, Mr. Gantt's testimony was properly challengeable, and was in fact challenged, by vigorous cross-examination, which significantly mitigated its risk of unfair prejudice. Cf. United States v. Gonzalez-Lira, 936 F.2d 184, 191 (5th Cir. 1991) (finding the prejudicial effect caused by evidence of past acts mitigated by the opportunity to cross-examine and by a proper limiting instruction); United States v. Lynn, 856 F.2d 430, 437 (1st Cir. 1988) (finding the risk of prejudice "especially distressing" where the defendant "could not . . . cross-examine the agent on the reliability of the information").

With respect to the other part of Rule 403's analysis, the District Court found that Mr. Gantt's testimony possessed "great probative value." On appeal, the government argues that the disputed testimony "was admissible to show the familiarity and interrelationship of Mathis, Gantt, and Seaberry," thereby tending to prove Mr. Mathis's conspiracy count. Appellee's Br. at 53-55. In evaluating this position, we take guidance from this court's holding in United States v. Scarfo, 850 F.2d 1015 (3d Cir. 1988). The defendant in Scarfo was convicted of conspiring to extort, and of extorting, money from a real estate developer. The district court admitted testimony from two of the defendant's co-conspirators stating that, prior to the charged extortion, they had committed two murders pursuant to the defendant's orders. These co-conspirators also testified about numerous details of the defendant's "crime family," including uncharged murders, briberies, and extortions. On appeal, we affirmed the defendant's conviction, holding that "[b]ecause the government's case against the defendants rested on the testimony of unindicted co-conspirators, evidence describing their relationship to the defendants and providing background information to illustrate the

8

witnesses' roles in the scheme was properly admitted." Id. at 1020. Also, in order for the jury "to realize that [the co-conspirators] had been granted immunity for the very murders that they asserted Scarfo had ordered" and thereby to assess the witnesses' motive for testifying, we concluded that such evidence was "essential in the government's effort to establish the credibility of its disreputable, yet indispensable witness." Id.

The charged conduct here, of course, lacks much of the gravity and extensiveness associated with the activities described in Scarfo, but the applicable legal principles are not so dissimilar. Mr. Mathis was indicted for a conspiracy, whose details the government was required to prove, and Mr. Gantt was the government's only witness who could describe the conspiracy directly. Mr. Gantt's testimony regarding the eleven uncharged robberies, if believed by the jury, explained both Mr. Gantt's role in the conspiracy and his motive for testifying, i.e., to fulfill his plea agreement and reduce his sentence. This testimony also tended to show that, in addition to their previous associations, Mr. Gantt and Mr. Mathis conspired in robbing Sun National Bank, on the theory that co-conspirators more often trust those with whom they are already intimate. Contrary to Mr. Mathis's argument that the disputed testimony was unnecessary given other evidence in the case, Mr. Gantt's testimony was the only direct evidence offered for the purposes listed above. Accordingly, for reasons parallel to those in Scarfo, we deem Mr. Gantt's testimony significantly probative of Mr. Mathis's involvement in the charged conspiracy.[2]

_____

2. The government also argues that Mr. Gantt's testimony demonstrates a common modus operandi. The government's position begins with the solid premise that "[a] jury can rationally infer from evidence that the defendant committed a prior crime in an unusual and distinctive manner and evidence that a second similar crime was committed in the same unusual and distinctive manner that the defendant committed the second crime." Gov't of Virgin Islands v. Pinney, 967 F.2d 912, 916 (3d Cir. 1992). In order to distinguish this type of inference from impermissible conclusions based on propensity or bad character, however, the admissibility of such evidence critically depends on the degree to which the "manner" employed is "unusual and distinctive." 1

9

After reviewing the District Court's explanation for its ruling, we find no abuse of discretion in the District Court's conclusion that the disputed testimony's danger of unfair prejudice did not substantially outweigh its probative value. Mr. Gantt's testimony about the uncharged robberies provided significant background information bolstering the charged conspiracy's plausibility, and the risk of prejudice attending such evidence was mitigated by the opportunity for cross-examination and by the District Court's limiting instruction. Thus, we hold that the District Court did not abuse its discretion by declining to exclude Mr. Gantt's testimony.

B. Evidence of Photographic Identification

Before trial, the District Court conducted an evidentiary hearing to determine the admissibility of testimony from Sergeant Gubbei stating that he saw Mr. Mathis exit the Jeep on October 14, 1998, and that he selected Mr. Mathis's picture from a photographic array on October 15, 1998. At that hearing, Sergeant Gubbei testified that he chose Mr. Mathis's photograph from an array of eight photographs at the Maple Shade police department, and Mr. Mathis moved to exclude such testimony because Sergeant Gubbei had previously seen an identical

---

McCormick on Evidence 662-63 (John W. Strong ed., 5th ed. 1999) ("Much more is demanded than the mere repeated commission of crimes of the same class, such as repeated murders, robberies, or rapes. The pattern and characteristics must be so unusual and distinctive as to be like a signature.") (footnotes omitted). On this point, Mr. Gantt's testimony indicated only that all of the uncharged robberies at issue occurred near Camden, New Jersey, within approximately four months of one another, and that the robbers wore gloves and masks. Mr. Gantt further testified that sometimes his girlfriend waited outside the target bank in a car, other times she did not; sometimes one robber acted as an armed guard near the bank's door, sometimes not; sometimes the robbers would use a stolen getaway car, other times not; sometimes they used a .45 caliber handgun, other times a .22 caliber handgun, and sometimes they used toy guns or screwdrivers taped to look like guns. None of the authorities cited by the government has approved modus operandi admissibility based on such inconsistent and generally non-distinctive characteristics, and we find the evidence in this case insufficient to support such a theory.

10

photograph of Mr. Mathis. Specifically, a Maple Shade detective had, roughly one month before the robbery, given Sergeant Gubbei materials describing various bank robbery suspects. According to Sergeant Gubbei, these materials included between thirteen and fifteen pages with approximately seven photographs of bank robbery suspects, and one of these photographs--virtually identical to that later placed in the array--depicted Mr. Mathis. 3

Mr. Mathis argued that admitting this testimony from Sergeant Gubbei would violate the Due Process Clause's protection against certain suggestive identification procedures. In particular, Neil v. Biggers, 409 U.S. 188 (1972), held that, for out-of-court identifications, "convictions based on eye-witness identification . . . will be set aside only if the photographic identification was so impermissibly suggestive as to give rise to a very substantial likelihood of . . . misidentification." Id. at 196–97 (internal quotation omitted).4  Biggers further declared that likelihood of misidentification should be measured by a totality of circumstances including: the witness's initial opportunity to view the suspect at the crime scene and degree of attention at that time, the witness's level of certainty in the disputed identification, the length of time between initial viewing and disputed identification, and the accuracy of any intervening description of the suspect occurring between those two events. Id. at 199–200.

In the present case, Mr. Mathis contended that "the very fact of [a] previous viewing" was itself sufficient to establish the identification procedure's suggestiveness. He further argued that a substantial likelihood of misidentification arose both from Sergeant Gubbei's limited opportunity to view Mr. Mathis as he fled and from Sergeant Gubbei's

_____

3. We base much of our analysis on Sergeant Gubbei's testimony because the materials themselves, aside from the page containing Mr. Mathis's picture, apparently were not introduced into evidence.

4. See also United States v. Emanuele, 51 F.3d 1123, 1128 (3d Cir. 1995) (interpreting later cases as requiring only a "substantial risk of misidentification").

11

degree of attention, which was arguably impaired by other people and events he witnessed at that time.5

The government replied that Sergeant Gubbei's testimony showed that he had only reviewed the materials containing Mr. Mathis's photograph once or twice, immediately after receiving them approximately a month before the Sun National Bank robbery. Furthermore, Sergeant Gubbei stated he had attended most closely to the suspects' modi operandorum, not to their photographs. The government also noted that Sergeant Gubbei described his view of Mr. Mathis's face on October 14 as unobstructed and clear, and that he exhibited both a high degree of attention in watching the Jeep's occupants disembark and a high level of certainty in making his subsequent photographic identification.

In denying Mr. Mathis's motion to exclude the testimony, the District Court followed this court's two-step process for applying Biggers:

> The first question is whether the initial identification procedure was `unnecessarily' . . . suggestive. This inquiry . . . contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures. If a procedure is found . . . unnecessarily suggestive, the next question is whether the procedure . . . gave rise to such a `substantial likelihood of . . . misidentification' that admitting the identification would be a denial of due process.

United States v. Stevens, 935 F.2d 1380, 1389 (3d Cir. 1991) (internal quotation omitted). The District Court ruled that Mr. Mathis did not "initially demonstrate[that] the identification was impermissibly suggestive"; the District Court then proceeded to find that Sergeant Gubbei's identification was reliably based in fact and most likely did

_____

5. Mr. Mathis conceded that Biggers's"length of time" factor weighed in favor of admitting the evidence, since the contested identification occurred just one day after Sergeant Gubbei viewed the Jeep's passenger.

12

not result from impermissible suggestion. The District Court also found that the "background of the photo of the defendant is no darker or lighter than the other photos," that the cropped pictures did not reveal any difference in the subjects' build, and that the eight men "have the same skin tone, have the same facial features, eyes, nose, lip shape, [and] facial hair."

We review the District Court's decision for abuse of discretion, applying clear error review to its underlying factual findings and plenary review to its conclusions drawn from such facts. United States v. Emanuele , 51 F.3d 1123, 1127 (3d Cir. 1995); see also Sumner v. Mata, 455 U.S. 591, 597 (1982) (discussing the relationship between fact and law in the context of pretrial identifications). On appeal, both parties have primarily disputed the factual reliability of Sergeant Gubbei's identification and whether there existed a substantial likelihood of misidentification. We affirm, however, based solely on the first part of the Stevens test, i.e., the District Court's determination that Mr. Mathis did not show the photographic identification to be unnecessarily suggestive. See United States v. Hill, 967 F.2d 226, 230 (6th Cir. 1992) (noting the defendant's burden of proof on this issue).

Mr. Mathis contends, as he did before the District Court, that "a photographic array created for purposes of a bank robbery investigation--which consists of seven photos the witness has never seen before, and one photo the witness has seen before in the very context of a bank robbery investigation--is by its very nature unduly suggestive." Appellant's Br. at 14. We disagree, finding that, without more, this allegation speaks only to the weight of the evidence and, thus, may properly be argued to the jury--as Mr. Mathis did in this case. Cf. Manson v. Braithwaite, 432 U.S. 98, 116 (1977) ("[E]vidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."). The unadorned fact that Sergeant Gubbei briefly viewed Mr. Mathis's picture, as part of a collection of materials distributed one month before the robbery, does not demonstrate sufficient suggestiveness to

13

require constitutional inquiry into whether a misidentification might have occurred in this case.

Since we have not discovered cases squarely addressing facts like these, we are primarily guided by principles articulated in Stevens, 935 F.2d at 1380, where the defendant's picture was selected from a photographic array by two witnesses who had previously identified the defendant from a police station's wanted board. That board, to which the witnesses were directed by a police officer as they filed their complaint, contained eight posters."[F]ive were composite sketches, one contained eight small photographs, and the other two were both photographs of [the defendant]. . . . [O]ne of his photographs was in color, whereas the other nine photographs were in black and white." Id. at 1388. In evaluating the suggestiveness of the board's collection of photographs, we acknowledged that the wanted board had "several suggestive attributes": "Whereas the posters of Stevens each contained photographs, most of the other posters had only composite sketches. Stevens's picture, moreover, was the only one that appeared twice . . . . Even more bothersome . .. are that Stevens's photographs were significantly larger than the others, and that Stevens was the only suspect portrayed in color." Id. at 1390. Each of these features "quite possibly could have drawn the victims' attention to Stevens" independent of the witnesses' recollection. Id. But we also noted certain considerations that counseled against deeming such suggestiveness "unnecessary," including the fact that the wanted board had not been "arranged with this particular crime in mind. It was, rather, a collection of random sketches and photographs that had been assembled in order to facilitate chance identifications . . . ." Id. Measured against this general law enforcement purpose, we also noted that wanted boards often cannot be made with photographs of uniform size. Thus, although aspects of the particular wanted board in Stevens were unnecessarily suggestive, we made significant efforts to stress that such displays generally are not so. Compare id. with id. at 1390 n.12.

Here, the materials that Sergeant Gubbei received were apparently assembled for a law enforcement purpose whose

14

validity is not challenged. Such materials obviously were not prepared or circulated with the Sun National Bank robbery (which occurred thereafter) in mind, nor, it seems, with awareness of influencing any photographic identification procedures. Cf. Emanuele, 51 F.3d at 1129 ("[W]e expressly do not require defendant to establish the government's state of mind. On the other hand, evidence that the government intended and arranged such [a potentially suggestive] encounter would be a substantial factor in the court's analysis."). We hold that, with respect to the present facts, due process does not protect defendants like Mr. Mathis from photographic materials briefly viewed one month before the disputed identification, when such materials are distributed only for purposes of general law enforcement. The brief time that elapsed between Sergeant Gubbei's receiving the materials and his selecting Mr. Mathis's picture from the photographic array significantly reduces the level of cognizable "suggestiveness" at issue. And though it might seem preferable, or even more effective, for police departments to use photographs in identification arrays that are different from those used in previously distributed suspect data, we do not find an identification "unnecessarily suggestive" simply because the same photograph, or a very similar photograph, is used in both. Law enforcement agencies commonly lack an abundance of particular suspects' photographs for use in assembling photographic arrays. And even where various pictures are on hand, lists are not often kept recording which pictures have been circulated to officers who later happen to be eyewitnesses. Given such operational circumstances--similar to those concerning police station wanted boards--we cannot agree that Sergeant Gubbei's prior exposure to Mr. Mathis's photograph, in and of itself, renders his subsequent identification unnecessarily suggestive.

Mr. Mathis further claims that certain "additional circumstances" aggravated the suggestiveness of Sergeant Gubbei's photographic identification. First, Mr. Mathis notes that Sergeant Gubbei chose Mr. Mathis's photograph only after Mr. Gantt had already identified one of his co-conspirators by name as "Mr. Mathis." We agree with the government, however, that there is no evidence to connect

Mr. Gantt's identification of Mr. Mathis by name with Sergeant Gubbei's identification of Mr. Mathis by image. Since the photographic array did not list the names of its subjects, Mr. Mathis has failed to show how Mr. Gantt's prior identification by name increased the photographic array's suggestiveness. Second, Mr. Mathis claims that, of the eight photographs in the array, Mr. Mathis's picture "quite obviously" was the only one of a "slender and slight" build. We review for clear error the District Court's factual finding to the contrary, and we find none. The array at issue portrays only the subjects' heads and necks, making their general physiques very difficult to estimate. Even from this limited view, however, it seems that at least two other photographs depict men of a build similar to Mr. Mathis's. Third, Mr. Mathis claims that the background of Mr. Mathis's photograph "was noticeably darker than the remaining seven." Upon reviewing the array, we agree and find the District Court's finding to the contrary clearly erroneous; thus, we must assess the impact of this circumstance on the alleged "unnecessary suggestiveness" of Sergeant Gubbei's identification. Although Mr. Mathis's picture is darker than the others in the array, there are at least three other pictures whose backgrounds are somewhat dark. Given the current technological state of photographic reproduction, and the variety of backgrounds evident in the eight pictures at issue, we hold that the slightly darker background of Mr. Mathis's picture did not significantly contribute to the array's unnecessary suggestiveness. See United States v. Burdeau, 168 F.3d 352, 357 (9th Cir. 1999).

In sum, we find that Sergeant Gubbei's photographic identification was not "unnecessarily suggestive" to the degree required by Biggers. Due process does not mandate the removal of testimony like Sergeant Gubbei's from the jury's consideration, even if such evidence presents (as much admissible evidence does) a risk of misidentification. On the contrary, such modest levels of "suggestiveness," which are not deemed constitutionally "unnecessary," speak only to the evidence's ultimate reliability and should therefore be argued for authoritative appraisal to the factfinder. On the current record, we find no abuse of

16

discretion in the District Court's decision to admit Sergeant Gubbei's testimony into evidence.

C. Expert Testimony Regarding Eyewitnesses

After the government had presented its witnesses, Mr. Mathis sought to present testimony from Dr. Geoffrey Loftus regarding the reliability of eyewitness identifications such as Sergeant Gubbei's. The District Court conducted an evidentiary hearing to determine whether such testimony was admissible. During that hearing, Dr. Loftus testified that he had received a doctoral degree from Samford University in clinical psychology and had served as a professor at the University of Washington for over twenty-five years. His doctoral dissertation concerned humans' ability to recall and recognize pictures from memory, and his subsequent studies in the field of human perception and scientific methodology were published as books and professional journal articles. Based on these and other academic credentials, the District Court qualified Dr. Loftus as an expert in the field of human perception and memory.

Dr. Loftus then proffered testimony on four topics concerning the operation of human memory: (i) the preconditions for forming accurate memories, (ii) the confounding impact of "double identification" or "post-event information," (iii) the relationship between individuals' confidence in describing memories and the accuracy of such memories, and (iv) potential disruptions caused by "weapons focus." With respect to memory formation, Dr. Loftus observed that, among other circumstances, the brevity of one's visual exposure to an object tends to cause an incomplete memory, which might later be especially susceptible to biasing influences. Dr. Loftus described "double identification" as a problem in determining whether one's memory derives from one of two or more possible visual exposures to an object. According to Dr. Loftus, a witness's recognizing someone, under circumstances similar to those described by Sergeant Gubbei, could derive either from the witness's actually having seen the recognized person or from a previous exposure to that person's photograph. Dr. Loftus indicated, citing scientific studies, that when one encounters a remembered image along with "post-event information" suggesting a particular

17

context from which the image might be remembered (such as the Sun National Bank robbery's photographic array), such post-event information can become incorporated with the original memory, creating an inaccurately "remembered" association between the image and its source. Regarding witnesses' confidence in their identifications, Dr. Loftus stated that "the correspondence between confidence and accuracy is, at best, about 25 percent." He further explained that when conditions attending the recalled memories are poor, "when, for example, there is only a brief duration . . . [or] incorrect post-event information introduced to the [observer], it's under those circumstances that the relation between confidence and [accurate] memory is zero." And on the topic of "weapons focus," Dr. Loftus discussed studies finding that the presence of a dangerous weapon can weaken one's ability to recall other aspects of a remembered scene, including individuals present therein.

In applying these principles to hypothetical questions intended to simulate the facts of this case, Dr. Loftus stated that "it's two to three times as likely that the identification in the photo montage was made based on seeing the photograph four weeks earlier than it was based on seeing the individual" who fled on October 14, 1998. Dr. Loftus also concluded that, if the photo array did not actually depict the person who exited the Jeep, that array itself would constitute incorrect post-event information. And such misinformation might have caused Sergeant Gubbei's identification of Mr. Mathis to reflect the man seen in the previously viewed photograph, who was observed under conditions favorable to memory formation, rather than the man seen running away, who was observed under conditions unfavorable to memory formation. Dr. Loftus further opined that the officer's confidence in this identification and the factual accuracy thereof would have a probabilistic relationship of "essentially zero" under such circumstances.

Mr. Mathis moved to admit the foregoing testimony into evidence pursuant to Federal Rule of Evidence 702, which provides:

18

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In particular, Mr. Mathis argued that Dr. Loftus's testimony was based on generally accepted scientific methods and data, that there was a direct relation between the proffered testimony and the factual issues in dispute, and that the proffered testimony would"refute common assumptions about the reliability of eye witness identification testimony that will assist the jury to weigh the credibility of Sergeant Gubbei's eye witness identification."

The District Court excluded Dr. Loftus's testimony, but it ratified Dr. Loftus's qualifications as an expert and dismissed all methodological challenges to the studies he cited. The following constitutes the District Court's explanation of its ruling:

> I'm particularly concerned with [Rule] 403 and I'm inclined not to allow this testimony. I believe this testimony has the probability of confusing and misleading the jury. I find no problem with his qualifications. Obviously he is qualified in this area. The debate over the differences in the studies is an interesting academic debate. As [defense counsel] points out, however, there is only one [w]ay to run the studies. You can't run them in a live situation, they have to be in a controlled situation. That does not give me pause.
>
> What does give me pause is the fact that I believe that in point of fact, there is a probability that there will be unfair prejudice here. The aura of reliability that's attached to an expert witness, I believe, is significant. Listening to this expert, it seems to me, that the testimony itself has the potential, if not controlling

19

probability of confusing the jury. There is no issue in this case about cross-racial identification. There is no issue about stress. They were the two more compelling issues about which I was concerned.

The issues concerning the focus at the time of the chase and when the defendant exited the vehicle are subject to the jury. The defense in this case had an untrammeled opportunity to cross and did, in fact, cross the police officer vigorously on that area. The testimony is, I think clear. Whether the jury accepts it or not, how the jury accepts it is clearly within their province. I do not see how this evidence will do anything, other than to confuse and mislead the jury. I decline the invitation to admit.

1. Admissibility of Dr. Loftuss Testimony

We review the District Court's decision to exclude Dr. Loftus's testimony for abuse of discretion. General Electric Co. v. Joiner, 522 U.S. 136, 143 (1997); Oddi v. Ford Motor Corp., 234 F.3d 136, 146 (3d Cir. 2000). Although the District Court explicitly rested its decision on Rule 403's standards for probative value and prejudice, the government on appeal invokes only Rule 702's prescriptions regarding expert testimony. We will address both rules, beginning with Rule 702.

This court has construed Rule 702 as embodying "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000). Only "fit" is contested here; the government acknowledges that Dr. Loftus is a properly qualified expert and that his methods, principles, and data are of a sufficiently reliable scientific character. See generally Daubert v. Merrell Dow Pharm., 509 U.S. 579, 592-94 (1993) (discussing factors that may be considered in assessing scientific reliability); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994) (same).

Rule 702's fit requirement derives from the textual provision that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

20

The requirement is "not intended to be a high one," however, Oddi, 234 F.3d at 145, and its principle is not dissimilar to the Federal Rules' general provision that, unless otherwise specified, "[a]ll relevant evidence is admissible" and "[e]vidence which is not relevant is not admissible." Fed. R. Evid. 402; Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) (interpreting Rule 702 as requiring all expert testimony to be relevant and reliable). Compare United States v. Downing, 753 F.2d 1224, 1230 (3d Cir. 1985) (noting "the liberal standard of admissibility mandated by Rule 702"), with Daubert, 509 U.S. at 587 (noting that Rule 402's "basic standard of relevance is a liberal one"). See generally Daubert, 509 U.S. at 592 (describing inquiry under Rule 702 as a determination "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue").

The clearest guide for interpreting Rule 702 in the context of this case is United States v. Downing , 753 F.2d at 1226, wherein this court, in 1985, first considered the admissibility of expert testimony concerning human memory and eyewitness testimony. In Downing, we discussed certain of the rationales advanced by other courts of appeals in prior years for excluding such testimony, including notions that relevant issues could adequately be raised through cross-examination and common sense, that such testimony usurps the jury's function, and that such evidence would lead to an unduly confusing "battle" of experts. Id. at 1229–30 & n.4. In explaining why we found those rationales unpersuasive, we disavowed skepticism of such testimony as a matter of principle, and we remanded for the district court to apply Rule 702's "helpfulness test." We described this test, in pertinent part, as follows: "[A]dmission depends upon the `fit,' i.e., upon a specific proffer showing that scientific research has established that particular features of the eyewitness identifications involved may have impaired the accuracy of those identifications." Id. at 1226.

In the case at bar, the government challenges the fit of Dr. Loftus's testimony in three respects. First, on the

21

subject of "double identification" and "post-event information," the government claims that Dr. Loftus's testimony did not pertain to the present facts because, according to Dr. Loftus's own theory, Sergeant Gubbei viewed Mr. Mathis's face only once, as part of the suspect materials, before selecting from the photographic array. Thus, the government claims, this case did not involve any "double" identification. Appellee Br. at 36. The government also argues that there was no post-event information "between the visual identification of Mathis on the day of the robbery and the photo array identification." Id. at 38. Each of these arguments misconstrues the substance of Dr. Loftus's testimony. As explained supra, double identification theory indicates that a person confronting an image may have a firm memory of having previously viewed the image, but may not have a similarly firm memory of when that viewing occurred. Given the suboptimal conditions for memory formation during the Jeep incident, and given the relative calm under which Sergeant Gubbei had previously seen a photograph of Mr. Mathis, Dr. Loftus testified that Sergeant Gubbei might have recalled Mr. Mathis's face from that previously viewed photograph but--because he was searching the photographic array in order to identify the Jeep's passenger--he might have wrongly associated the recalled photographic image with the fleeing robbery suspect. Contrary to the government's misunderstanding, the two pertinent "identifications" were the view of the suspect materials and the view of the man who fled.

Furthermore, according to Dr. Loftus, the photographic array constituted potentially inaccurate post-event information, which might have influenced Sergeant Gubbei wrongly to associate Mr. Mathis's image with the Sun National Robbery.6 Dr. Loftus also was of the view that

_____

6. The government argues that the photographic array was not distortive post-event information if, as we have now held, the array was not unconstitutionally suggestive. As our earlier discussion makes clear, however, the standards of "unnecessary suggestiveness" for admissibility under Biggers simply have no bearing on Dr. Loftus's testimony. A photographic identification may be highly suggestive as a psychological matter and still be deemed legally admissible as a constitutional one. A determination that such an identification is admissible poses no greater barrier to attack by expert testimony than it does to cross-examination.

22

Sergeant Gubbei's act of choosing Mr. Mathis's photograph from the several photographs constituting the photo array was itself post-event information that could have influenced Sergeant Gubbei's face-to-face identification of Mr. Mathis at trial. Dr. Loftus argued that these pieces of post-event information may have distorted each of Sergeant Gubbei's purported identifications of Mr. Mathis. Given the close correspondence between these aspects of Dr. Loftus's testimony and the factual issues disputed at trial, we conclude that the proffered evidence did not lack evidentiary fit for purposes of Rule 702.

Second, the government contends that Dr. Loftus's observations with respect to the weak relationship between an eyewitness's testimonial confidence and the accuracy of such testimony did not fit because, in the government's view, Dr. Loftus presented "nothing more than a general thesis on the correlation between confidence and accuracy." Id. at 44. As an initial matter, this characterization of the evidence appears mistaken. Dr. Loftus testified about the relationship between confidence and accuracy under specific circumstances similar to those in this case: an identification based on a brief view, in the presence of a deadly weapon, and several potentially distracting events on-going. Also, Sergeant Gubbei's testimony on direct examination indirectly implicated his confidence as an element supporting the credibility of his identification. In describing how he selected Mr. Mathis's photograph, Sergeant Gubbei was asked, "Q: Did you have any hesitation in determining those individuals [Mr. Mathis and Mr. Gantt]? A: No, I didn't." Later, after already having described his choice of Mr. Mathis's photograph from the array, Sergeant Gubbei was again asked, "Q: Sitting here today Sergeant, was your identification of Keith Mathis from the photo array based upon your viewing him the day before, following the bank robbery or on the photograph that you had been shown in the packet? A: I identified him from the incident that took place from the Sun National on the day before." The level of confidence underlying Sergeant Gubbei's identification came into more explicit focus during cross-examination:

> Q: [A]s we sit here today, is it even possible that the identification you made of Mr. Mathis in that photo

23

> array was based not on seeing him exiting that Jeep
> but on the previous opportunity to observe that
> photograph.
>
> A: No, I'm positive by him getting out of the vehicle
> . . . .
>
> Q: Your answer is it's not even a possibility?
>
> A: I guess there is a remote possibility, but I'm positive
> of the identification when he exited the vehicle.

Where Sergeant Gubbei testified so directly regarding his high confidence in the disputed identification, it seems clear that Dr. Loftus's testimony did address, for purposes of Rule 702, pertinent factual disputes in the case. See Stevens, 935 F.2d at 1400 (reaching an identical conclusion where the defendant sought "[t]o rebut the natural assumption that [the witnesses'] strong expression of confidence indicates an unusually reliable identification").

Third, the government argues that Dr. Loftus's opinions about "weapons focus" were not relevant to the present case because Sergeant Gubbei was a police officer who was quite accustomed to firearms, and because the relevant gun was pointed into the air, not at Sergeant Gubbei. Such arguments may be useful topics for cross-examination, but we do not find them persuasive grounds for exclusion under Rule 702. Dr. Loftus expressed the view that the phenomenon of weapons focus derives both from the infrequency with which most individuals view deadly weapons and from a survival instinct that draws one's attention to potentially threatening objects. He pointed out that various studies, performed by him and by other scientists, showed that a weapon's presence in a scene substantially affects subjects' ability to recall individuals in that scene. He further pointed out that close physical proximity of a weapon to another object (e.g. , the face of the Jeep's passenger) would not appreciably reduce the weapon's distortive influence on a witness's memory.

With respect to Sergeant Gubbei's being a police officer, Dr. Loftus acknowledged that one's degree of familiarity or unfamiliarity with the weapon at issue generally would affect the practical impact of weapons focus. But Dr. Loftus

24

also noted that the primary study on which he relied involved a knife, which, in his view, was an adequately familiar object for most people. Moreover, Dr. Loftus specifically rejected any notion that police officers would be immune to the psychological principles he described. With respect to the particular location of the gun, Dr. Loftus indicated that psychological studies inevitably take place in secure environments; thus, all of the cited studies assumed observers who were actually safe from the weapon at issue. He observed that the "survival" impetus for weapons focus would, in real life situations, likely be even higher than the cited studies indicated. Thus, we cannot agree with the government's suggestion that Dr. Loftus's expert opinions regarding weapons focus were not relevant for purposes of Rule 702.

Having concluded that the government's arguments for exclusion under Rule 702 cannot succeed, we turn now to Rule 403. As an initial matter, "[w]e are mindful that a trial court is in a far better position than an appellate court to strike the sensitive balance dictated by Rule 403. When a trial court engages in such a balancing process and articulates on the record the rationale for its conclusion, its conclusion should rarely be disturbed." Pinney, 967 F.2d at 918; see also Downing, 753 F.2d at 1242–43 (noting Rule 403's important role in assessing whether expert testimony's probative value is "substantially outweighed by other dangers, e.g., confusion of the issue or waste of time"). But when a district court does not explain its ruling, and no adequate explanation can be gleaned from the record, appellate courts often have little choice but to undertake such evaluation themselves. See e.g. , United States v. Murray, 103 F.3d 310, 319 (3d Cir. 1997) (noting that when district courts fail to explain their rulings under Rule 403, "we are able to perform this balancing here, [though] other cases may require remand . . . or even . . . a new trial"); United States v. Himelwright , 42 F.3d 777, 785 (3d Cir. 1994).

We find it difficult to accord the customary degree of deference to the District Court's discretion in this case because the District Court explained its ruling with little more than a series of conclusions:

25

> [T]his testimony has the probability of confusing and misleading the jury. . . . [T]here is a probability that there will be unfair prejudice here. The aura of reliability that's attached to an expert witness, I believe, is significant. Listening to this expert, it seems to me, that the testimony itself has the potential, if not controlling probability of confusing the jury. . . . [Sergeant Gubbei's] testimony is, I think, clear. Whether the jury accepts it or not, how the jury accepts it is clearly within their province. I do not see how this evidence will do anything, other than to confuse and mislead the jury.

The District Court clearly expressed concern with"[t]he aura of reliability that's attached to an expert witness"--which is one reason for district courts' "gatekeeping function" in assessing expert testimony under Rule 702. See Daubert, 509 U.S. at 592, 594. There is no suggestion, however, that such an aura of reliability was unwarranted in this case or, to be more precise, that it was unfairly prejudicial. From the record, it seems that Dr. Loftus was an extremely qualified, experienced academic presenting opinions on topics near the heart of his expertise. Moreover, Dr. Loftus's conclusions seem closely tied to empirical studies whose reliability is not impeached, and he explained the bases for these studies at apparently appropriate length. In short, we see no reason to believe that Dr. Loftus's aura of reliability reflected anything other than his actual reliability as an expert witness. With respect to the District Court's concern with "confusing and misleading the jury" and "unfair prejudice," we are unable to discern from these references, any more than from our own review of the record, how such problems might arise.

The government's oral argument before the District Court also fails to reveal any valid basis for exclusion under Rule 403. The government focused on two contentions. First, it claimed that the studies cited by Dr. Loftus did not sufficiently match the circumstances of this case. The District Court rejected this position, holding that such disputes "did not give [him] pause," and the government has conceded this issue on appeal.

Second, the government stated that:

26

> [T]he problem that bothers me most, your Honor, is the danger of overwhelming the jury. When we gave this witness a hypothetical that was slightly--you know, everyone in this courtroom knows the facts better than I do, but [it] sounded to me slightly tinged toward the defense version of the offense, the witness stated as a fact that the sergeant would not remember accurately. When I gave him the version that was a little bit closer to what I believe the facts to be and the Government version, he stated as a fact that his conclusion would be very different under those facts. So what he's doing is telling the jury the answer instead of allowing the jury to determine the facts for themselves. Any hypothetical that sets forth those facts is likely to have a serious effect on the jury's memory of the testimony rather than allowing the jury to decide what the jury's going to decide.

The full significance of this language is not clear. In part, the objection apparently derives from the fact that Dr. Loftus's answers regarding Sergeant Gubbei's memory changed when the hypotheses under consideration were altered regarding, for example, the number of seconds Sergeant Gubbei saw the fleeing man's face and the attention Sergeant Gubbei paid to the distributed suspect materials. Some might view such a change in an expert's analysis as the reward of a successful cross-examination; it seems hard to view such variation as a basis for excluding the testimony under Rule 403. The government did not demonstrate, and has not done so now, how this dimension of Dr. Loftus's testimony tended to cause any articulable degree of unfair prejudice, confusion, or delay.

Another aspect of the government's objection stems from a concern, which the District Court seemingly shared, that Dr. Loftus's testimony might usurp the jury's function. Insofar as this argument constitutes a general attack on expert testimony concerning eyewitness identifications, such issues are largely resolved by Downing. See id. at 1229–30 & n.4. Similar to other types of expert witnesses, who might testify about the flaws of a computerized filing system or the proper interpretation of satellite photographs, experts who apply reliable scientific expertise to juridically

27

pertinent aspects of the human mind and body should generally, absent explicable reasons to the contrary, be welcomed by federal courts, not turned away. Cf. United States v. Smithers, 212 F.3d 306, 311–12 & n.1 (6th Cir. 2000) (describing a judicial trend toward, and an empirically supported need for, accepting expert testimony about eyewitness identification). In this case, Dr. Loftus made quite clear that he did not intend to tell the jury whether Sergeant Gubbei was lying or telling the truth. Like more typical sorts of expert witnesses, Dr. Loftus attempted to provide information that, if itself deemed credible, might cause the jury to evaluate Sergeant Gubbei's testimony in a different light.

In analyzing for ourselves whether the four components of Dr. Loftus's testimony7 were admissible, we follow standards set forth in United States v. Stevens , which is also discussed supra in Part II.B. In Stevens, the defendant proffered expert testimony on six topics: "(1) the accuracy of cross-racial identifications; (2) the effect of weapon focus on identifications; (3) the effect of stress on identifications; (4) the suggestiveness of the wanted board [from which the defendant was initially identified]; (5) the relation back of subsequent identifications to the initial identification; and (6) the lack of correlation between confidence and accuracy in eyewitness identifications." 935 F.2d at 1397. The district court permitted expert testimony on the first three, but excluded testimony on the remainder.

On appeal, the Stevens court affirmed the exclusion of proffered testimony regarding the wanted board's "suggestiveness," in deference to the district court's determination that " `[t]he fact that there are two pictures . . . of the same person and one [is] in color, I think[,] . . . is certainly apparent [to] the jury . . . for the jury to make its own determination.' " Id. at 1399; cf. United States v. Gibbs, 190 F.3d 188, 212 (3d Cir. 1999) ("We have upheld the exclusion of expert testimony when that testimony ventures into areas in which the jury needs no aid or illumination."). Similarly, in this case, Dr. Loftus's

_____

7. Memory formation, double identification and post-event information, the relationship between confidence and accuracy, and weapons focus.

testimony--claiming that more accurate memories are produced by objects that are viewed for longer periods of time--is not the type of information that, in and of itself, would warrant exposition by an expert witness; thus, we concur in the District Court's decision to exclude such testimony under Rule 403.8

Stevens's expert testimony regarding "relation back" apparently explained that "once a witness makes an identification, he or she will tend to stick with that initial choice at subsequent photographic arrays or lineups, even if it was erroneous." Stevens, 935 F.2d at 1399. Such evidence closely resembles the part of Dr. Loftus's testimony on "double identification" and "post-event information" that explained how, after Sergeant Gubbei had already selected Mr. Mathis's picture from the array, his in-court identification was likely to be consistent therewith, regardless of any actual memory of the underlying events. In Stevens, we affirmed the exclusion of expert testimony on this topic because we found the testimony "rather pedestrian" and "susceptible of elucidation without specialized knowledge." Id. at 1399-1400. We are bound to reach a parallel conclusion here; hence, we affirm the exclusion of Dr. Loftus's testimony on this subject.

Another portion of Dr. Loftus's discussion of "double identification," however, was significantly more complex than the testimony at issue in Stevens. In particular, Dr. Loftus described studies in which subjects remembered having seen an image, but, upon being asked to associate that image with one of two times they might possibly have seen it, the subjects often "remembered" inaccurately. Dr. Loftus further explained how Sergeant Gubbei might have clearly remembered Mr. Mathis's face from having previously seen a photograph of Mr. Mathis, but might have confidently and incorrectly associated that memory with the

_____

8. We do not mean to bar, by this determination, the strong possibility that parts of Dr. Loftus's account of memory formation might have been properly admissible as a necessary precursor, or ancillary, to other admissible testimony regarding memory. Our ruling merely indicates that such testimony, in and of itself, does not necessarily surmount the barrier of Rule 403.

29

previous day's fleeing suspect. Dr. Loftus indicated that such a misidentification was peculiarly likely in circumstances where one possible event-memory association (the previously viewed photograph) involved favorable conditions for memory formation and involved the same visual medium as the image to be identified (a photograph), whereas the other event-memory association (the robbers' escape) involved unfavorable memory conditions and a different visual medium (three-dimensional observation). We believe that testimony of this sort, with its accompanying level of scientific detail, would not simply duplicate jurors' intuitions or common sense, and such principles seem difficult to establish indirectly through cross-examination. Accordingly, we find that the District Court abused its discretion in excluding such testimony.

The third type of testimony analyzed in Stevens concerned the relationship between an eyewitness's confidence and the accuracy of a resultant identification. Dr. Loftus opined on this same topic in the present case, stating that the correspondence between confidence and accuracy is "at best, about 25 percent" and, under circumstances like these, is "essentially zero." In Stevens, we held that such information was sufficiently illuminative and susceptible to scientific expertise that exclusion was unacceptable under "the liberal standard of admissibility of Rule 702" and Rule 403. Id. at 1400-01. In the present case, the government objects that Stevens cannot "mean that [any time] an eyewitness has confidence in his identification, a defendant is automatically entitled to present testimony that confidence has little or no correlation to accuracy." Appellee's Br. at 43. We agree that Stevens did not establish such a universally applicable rule, and we also decline to do so here. As the government correctly notes, analysis under Rules 702 and 403 is fact-intensive and case-specific. That said, however, Stevens did hold that, when expert testimony of this character satisfies the reliability and fit requirements of Rule 702, and when there is no countervailing rationale for excluding the evidence under Rule 403, the evidence must be admitted. In light of our findings regarding this evidence's probative value and our inability to discover any offsetting prejudice,

confusion, or delay, we hold that the District Court abused its discretion in failing to admit Dr. Loftus's testimony on the relationship between eyewitness confidence and accuracy.

The final topic discussed by Dr. Loftus was "weapons focus." In Stevens, this issue was not before us because the District Court had admitted expert testimony on the subject. In light of the principles decided in Stevens, as well as those discussed supra, we find that Dr. Loftus's proposed testimony regarding weapons focus should have been admitted into evidence. The government argues that a jury does not need expert testimony to learn "the idea that one might be distracted by a weapon." Appellee's Br. at 34. But Dr. Loftus's testimony was not limited to such a narrow scope. In combination, the studies he discussed indicated that the presence of weapons weakened memories of other aspects of an observed scene, even when such weapons posed no immediate threat, and even when those weapons' images might be located quite near the object later to be identified. We find that the degree and scope of memory distortion that, according to Dr. Loftus, a weapon typically causes for eyewitnesses are not matters that would necessarily be apparent to jurors. And, just as with the other admissible aspects of Dr. Loftus's testimony, it is difficult to comprehend how weapons' destructive effect on memory might be elucidated through cross-examination. Especially if Dr. Loftus is correct that witnesses remain confident of their identifications even when those identifications are inaccurate, eyewitnesses cannot be expected--even under the most skilled questioning--explicitly to recall or nonverbally to reveal the extent to which their remembered impressions might have been distorted or undermined. We find that, in this case, and on this record, it was an abuse of discretion not to admit such testimony into evidence.

D. Harmless Error

Our final step is to consider whether the District Court's error in excluding parts of Dr. Loftus's testimony was legally harmless. See 28 U.S.C.A. S 2111 ("In the hearing of any appeal[,] . . . the court shall give judgment after an examination of the record without regard to errors or

defects which do not affect the substantial rights of the parties."); Fed. R. Crim. P. 52(a); Fed. R. Evid. 103(a); Kotteakos v. United States, 328 U.S. 750 (1946). This court has held that a non-constitutional error committed at trial does not warrant reversal in circumstances where"it is highly probable that the error did not contribute to the judgment." United States v. Helbling, 209 F.3d 226, 241 (3d Cir. 2000) (internal quotation omitted). And the applicable standard for " `[h]igh probability' requires that we have a sure conviction that the error did not prejudice the defendants. We may not simply conclude that it is more likely than not that the error was harmless. On the other hand, we may be firmly convinced that the error was harmless without disproving every `reasonable possibility' of prejudice." United States v. Jannotti, 729 F.2d 213, 220 n.2 (3d Cir. 1984) (internal citations omitted). The burden of demonstrating such high probability lies with the government, United States v. Adams, 2001 WL 543711 at *4 (3d Cir. May 23, 2001), but we retain our established authority to affirm on any ground supported by the record, Nicini v. Morra, 212 F.3d 798, 805 (3d Cir. 2000) (en banc); Alexander Hamilton Life Ins. Co. of Am. v. Gov't of Virgin Islands, 757 F.2d 534, 547–58 (3d Cir. 1985).

The government contends that, even if (as we now have found) the District Court wrongly failed to admit certain testimony from Dr. Loftus, Mr. Mathis's conviction should be affirmed because the government presented other evidence that constituted more "compelling evidence of Mathis's guilt than Sergeant Gubbei's identification." Appellee's Br. at 47. In particular, the government relies on testimony from Mr. Gantt, who described his cooperation with Mr. Mathis in robbing the Sun National Bank and eleven other banks. According to the government, Mr. Gantt's "tremendous opportunity to observe, speak to, and identify Mathis was damning and far outweighed Sergeant Gubbei's testimony in importance." Id. Mr. Mathis replies by challenging Mr. Gantt's credibility, both noting that Mr. Gantt lied to police after his arrest and arguing that Mr. Gantt's plea agreement provided a motive to lie if doing so might advance Mr. Mathis's prosecution. In Mr. Mathis's view, the government wrongly urges this court to"speculate

32

that the jury would have convicted defendant . . . had it
. . . heard Dr. Loftus' testimony . . . . [T]he jury may well
have concluded that the government had failed to bear its
burden of proving beyond a reasonable doubt that . . .
[Mathis] participated in the Sun National Bank robbery."
Reply Br. at 23. In essence, the government asks this court,
apparently as a matter of first instance, to weigh the import
of Mr. Gantt's testimony against that of Sergeant Gubbei's
testimony, while Mr. Mathis asks us not to "speculate"
about what the jury would have done if Dr. Loftus had
testified.

We find that neither of these suggestions, viewed in
isolation, is well-suited to our role in this appeal. As the
Supreme Court held in Kotteakos:

> [I]t is not the appellate court's function to determine
> guilt or innocence. Nor is it to speculate upon probable
> reconviction and decide according to how the
> speculation comes out. . . . Those judgments are
> exclusively for the jury . . . . But this does not mean
> that the appellate court can escape altogether taking
> account of the outcome. . . . In criminal causes that
> outcome is . . . . guilt in law, established by the
> judgment of laymen. And the question is, not were they
> right in their judgment . . . . It is rather what effect the
> error had or reasonably may have had upon the jury's
> decision. The crucial thing is the impact of the thing
> done wrong on the minds of other men, not on one's
> own, in the total setting.

Kotteakos, 328 U.S. at 763–64. Our inquiry is not whether
this court's members would convict Mr. Mathis on the
evidence presented, or whether we would do so based on
that evidence plus Dr. Loftus's wrongly excluded testimony.
Rather, we begin with the guilty verdict the jury has already
rendered, and we determine only whether, "after an
examination of the record," 28 U.S.C.A. S 2111, "it is highly
probable" that the jury would have reached the same
decision absent the identified error. Helbling , 209 F.3d at
241.

Although we believe that portions of Dr. Loftus's proffered
testimony should have been admitted, we also find that, in

33

the context of the record as a whole, his testimony was highly unlikely to have caused a different result. The matter is not resolved simply by noting--as the government does--that Mr. Gantt's testimony could, if believed, have had great probative force and might have constituted more "compelling evidence" than Sergeant Gubbei's testimony. It is certainly possible that Mr. Mathis's jury would have convicted on the basis of Mr. Gantt's testimony alone, but we would hesitate before terming such a result "highly probable." Nor is it enough to find--as Mr. Mathis urges--that skeptical jurors might, with reasonable justification, have disbelieved both Mr. Gantt and Sergeant Gubbei. Reasonable doubt is the proper test for harmless error analysis concerning constitutional rights, e.g., Neder v. United States, 527 U.S. 1, 16 (1999), but a less stringent standard regulates non-constitutional errors such as this one, e.g., Kotteakos, 328 U.S. at 764-65; Jannotti, 729 F.2d at 220 n.2.

The crux of our analysis derives, not from any piece of testimony in isolation, but from the interlocking correspondence of evidence throughout the record. For example, it is not disputed that the testimony of several eyewitnesses, located inside and outside the bank building, confirmed Mr. Gantt's basic description of how the Sun National Bank robbery occurred. Photographs produced from the bank's video security cameras were similarly corroborative of this testimony. Also, Mr. Gantt's account of the robbers' foiled attempt to escape in the Jeep was virtually identical to Sergeant Gubbei's description of the same events from the perspective of his police cruiser. Mr. Gantt's identification of Mr. Seaberry as one of the co-conspirators was confirmed by an arresting officer's testimony that Mr. Seaberry was apprehended near the stalled Jeep, and the arrest of Mr. Seaberry also tended to corroborate Mr. Gantt's account of how he and Mr. Mathis (but not Mr. Seaberry) finally escaped.

Giving Dr. Loftus's testimony its full weight, a jury might have had reasonable cause to doubt Sergeant Gubbei's description of events, if such description were viewed in isolation. But here, where the disputed eyewitness account was repeatedly confirmed by a co-conspirator's testimony,

34

and where various aspects of that co-conspirator's testimony were in turn confirmed by other available evidence, we think it highly improbable that a jury that voted to convict without the aid of Dr. Loftus's testimony, would, had it heard that testimony, have reached a different verdict.

III. Conclusion

For the foregoing reasons, the District Court's judgment of conviction is affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit