**PROTOCOMM CORP., Plaintiff,**

v.

**NOVELL ADVANCED SERVICES, INC., et al., Defendants.**

No. 98–3819.

United States District Court, E.D. Pennsylvania.

Sept. 26, 2001.

David Smith, Schnader, Harrison, Segal & Lewis, Phila, PA, Christina Rainville, Jeannette M. Brian Jonathan S. Liss, Dionna K. Litvin, Schnader, Harrison, Segal & Lewis,Phila, PA, for ProtoComm Corporation.

Christina Rainville, Schnader, Harrison, Segal & Lewis, Phila, PA, Jennifer H. Adams, Morgan, Lewis & Bockius, LLP, Phila, PA, Dionna K. Litvin, Schnader, Harrison, Segal & Lewis, Novell, Inc. Phila, PA, for Novell, Inc.

Christina Rainville, Schnader, Harrison, Segal & Lewis, Phila, PA, David C. Franceski, Jr., Stradley Ronon Stevens & Young, Phila, PA, Dionna K. Litvin, for Novell Advanced Services, Inc.

Richard L. Mattiaccio, Steven Skulnik, Pavia & Harcourt, New York City, Glenn P. Callahan, Michael N. Feder, Mc Carter and English, Phila, PA, Michael B. Pullano, Mccarter & English, LLP, Philadelphia, Pa, for David L. Nelson, Edelson Technology Partners II, L.P., Olivetti Holding, N.V., L.P., Cornelius A. Ferris, Premkumar Uppaluru.

Timothy W. Callahan, II, James A. Keller, Saul, Ewing, Remick & Saul, Phila, PA, Jane E. Willis, Martin Newhouse, Ropes & Gray, Boston, MA, Paul G. Nofer, Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Philadelphia, PA, for Aeneas Venture Corporation.

Glenn P. Callahan, Michael N. Feder, Scott A. Birnbaum, Testa, Hurwitz & Thibeault, LLP, Boston, MA, Michael B. Pullano, for Technologies for Information & Publishing, L.P.

Morton R. Branzburg, Shari Amster, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, Paul G. Nofer for Ascii Corporation.

Seamus C. Duffy, Robert A. Particelli, Drinker, Biddle & Reath LLP, Philadelphia, PA, for Cirrus Logic, Inc., Fip II Ltd.

Arthur Makadon, Leslie E. John, Ballard, Spahr, Andrews And Ingersoll, Phila, PA, for Cirrus Logic, Inc.

Thomas C. Zielinski, Robert V. Dell'osa, Sarah E. Davies, Cozen & O'Connor, Phila, PA, for Intel Corporation.

## MEMORANDUM

LOWELL A. REED, Jr., Senior District Judge.

Two motions to preclude expert testimony, affidavits and reports pursuant to *Daubert* and its progeny are presently before this Court in this third generation lawsuit which sprung from a breach of contract dispute between plaintiff ProtoComm Corporation ("ProtoComm") and Fluent, Inc., ("Fluent"), now Novell Advanced Services ("Novell").[1] Defendants Technology for Information and Publishing, L.P., David L. Nelson, Cornelius A. Ferris, and Premkumar Uppaluru (collectively referred to as "Former Fluent Shareholders") filed a motion to preclude the testimony of Michael Pakter ("Pakter") (Document No. 68), and ProtoComm filed a motion to exclude the affidavits and testimony of Gabriel F. Nagy ("Nagy") and the Report and Testimony of Ellis L. Levin ("Levin") (Document No. 81). Upon consideration of the motions, responses and replies thereto, and for the reasons set forth below, I will deny both motions.

**1.** Jurisdiction is proper pursuant to 28 U.S.C. § 1332 based upon the citizenship of the parties as diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## I. Standard

Federal Rule of Evidence 702, as amended December 1, 2001, provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

 Under Rule 702, when "[f]aced with a proffer of expert scientific testimony ... the trial judge must determine at the outset, pursuant to Rule 104(a) whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact issue." *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993) (footnote omitted). It is now well settled that this gatekeeping function extends beyond scientific testimony to "testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999).

 The Court of Appeals for the Third Circuit has established that Rule 702 as interpreted by *Daubert* and its progeny embodies " 'three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit.' " *U.S. v. Mathis,* 264 F.3d 321, ——, 2001 WL 995170, at *11 (3d Cir.2001) (quoting

*Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir.2000)). The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir.2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 1357, 149 L.Ed.2d 287 (2001). The parties bring forth their respective challenges on all three grounds.[2]

The following standard for qualifying an expert has been articulated:

> Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony. The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts." However, "at a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman...."

*Elcock*, 233 F.3d at 740 (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir.1998)).

 The factors which govern reliability are as follows:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on

the methodology; and (8) the non-judicial uses to which the method has been put.

*Elcock*, 233 F.3d at 745–46 (quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 n. 8 (3d Cir.1994) ("Paoli II")). Of course, these factors were devised in the context of testing the reliability of scientific methods of proof and do not so readily and easily apply in the context of testing the reliability of opinions concerning the characterization of complicated business transactions. *See Robert Billet Promotions, Inc. v. IMI Cornelius Inc.*, Civ. A. No. 95–1376, 1998 WL 151806, at *2 (E.D.Pa. Apr.1, 1998). With this in mind, it has been noted that *Daubert:*

> make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.... [T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.

*Elcock*, 233 F.3d at 745–46 (quoting *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. at 1176) (alterations in the original). Thus, the factors outlined above are not exhaustive and the inquiry remains flexible. *See Elcock*, 233 F.3d at 746. In some cases, such as the one here, "relevant reliability concerns may focus upon personal knowledge or experience," as opposed to "scientific foun-

---

**2.** I note that because I have ruled by separate opinion dated September 25, 2001, that only the fraudulent conveyance claim survives summary judgment, I will only address Pak-

ter's opinions concerning that claim and will not address his opinions with respect to the wrongful dividend claim.

dations." *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175.

■ The fit requirement stems from the textual provision that " 'scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Mathis,* 264 F.3d 321, 334 (quoting Fed. R.Evid. 702). Admissibility under this factor turns on " 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.' " *Oddi,* 234 F.3d at 145. This measure is " 'not intended to be a high one.' " *Id.* Its standard is not dissimilar to the general liberal standard of relevance under the Rules. *See Mathis,* 264 F.3d at 334. Plaintiffs are not required " 'to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of [the] evidence that their opinions are reliable.' " *Oddi,* 234 F.3d at 145 (quoting *Paoli II,* 35 F.3d at 744). Thus, the admissibility test is not whether the opinion has the "best foundation" or whether it is "demonstrably correct;" rather, "the test is whether 'the particular opinion is based on valid reasoning and reliable methodology.' " *Id.* at 145–46 (quoting *Kannankeril v. Terminix Int'l Inc.,* 128 F.3d 802, 806 (3d Cir.1997)). The trier of fact is left with the task of analyzing the conclusions themselves. *See id.* at 146.

## II. Pakter

■ Pakter is a certified public accountant, fraud examiner and chartered accountant with a Bachelor of Commerce degree as well as a Bachelor of Accounting and Auditing. (Pakter's *curriculum vitae,* Pl.'s Ex. B.) He has over twenty years of experience providing financial analysis, accounting, auditing, and investigative and forensic services to trial counsel, insurance claims specialists, business owners in various industries, as well as state and local governments. (*Id.*) He has developed a particular expertise in cases concerning allegations of fraud. (*Id.*) In the areas of bankruptcy and reorganization, he has assisted debtors and creditors, as well as the trustees and counsel representing them, to reconstruct complex, multimillion dollar transactions. (*Id.*) Some of these dealings have involved allegations of fraudulent conveyances. (*Id.*) He typically accomplishes his services by evaluating debtor's books and records. (*Id.*)

Pakter has also provided accounting and auditing services to business owners, investors and lenders. (*Id.*) These services have entailed performing fraud audits and forensic accounting for distressed and reorganized companies, as well as companies with incomplete records. (*Id.*) In the area of complex commercial litigation, Pakter has assisted counsel by providing damage assessments and evaluations of fraud and misrepresentation claims. (*Id.*) He also offers a wide range of consulting services to business owners and managers in many business industries, as well as to state and local governments. (*Id.*) Pakter is a member of the American Institute of Certified Public Accountants, the Association of Insolvency and Restructuring Advisors, as well as the Association of Certified Fraud Examiners.

Defendants contend that while Pakter is a qualified accountant, he is not qualified to render opinions regarding fraudulent conveyances or wrongful liquidation. Pakter's wide experience stands on its own. Pakter clearly has experience beyond the field of accounting. Specifically, I find that he has "specialized knowledge" which is clearly beyond that of the average lay-

man in the areas most relevant to this case: the characterization of complex business transactions and fraudulent conveyances. I therefore conclude that Michael Pakter meets the liberal standard and is qualified to testify as an expert witness.

Plaintiff summarizes Pakter's opinions regarding the acquisition into the following four overarching conclusions:

(1) Although the transaction was labeled a sale of stock, its substance was a sale of Fluent's assets to Novell.

(2) The purchase price paid by Novell went to Fluent's shareholders; Fluent's treasury received no consideration for the conveyance of those assets, leaving it with no assets to pay the ultimate $12.5 million judgment to ProtoComm.

(3) Novell's acquisition liquidated Fluent, leaving it with no assets to pay the ultimate $12.5 million judgment to ProtoComm.

(4) Consequently, Novell's acquisition of Fluent was either "a wrongful dividend that left Fluent with no assets to pay its creditors or a liquidation in which not all creditors were paid before shareholders received distributions."

(Pl.'s Mem. at 3) (citations omitted). These conclusions were extracted from Pakter's Expert Report. (Pl.'s Ex. A.) Pakter's Supplemental Expert Report details a 14 stage process in which the financial analysis was performed. (Pl.'s Ex. C.) The report states that the opinions given by Pakter and Russell Novak & Company, LLP[3] were "[b]ased on our education, training and professional experience, the documents we reviewed and the financial analysis we performed." (Pl.'s Ex. A at

11.) The 14 stage procedure is explained below.[4]

First, they read certain relevant documents. The Expert Report includes an eight page list of reviewed documents. Second, they prepared a purchase price analysis of the acquisition. (Ex. 1 of Pl.'s Ex. A.) In order to conduct this analysis, they compared the total cash payments and total purchase price pursuant to the Merger Agreement, Novell's 10–K, and Fluent's June 15, 1993 Proxy Statement. They also considered the asset calculation in the Ernst and Young Report. In stages three through five, they reviewed and summarized Novell's financial analysis of its basis in Fluent's net assets, Novell's allocation of its purchase price of Fluent's total assets, and the Ernst and Young Report. The Ernst and Young Report was also considered in conjunction with the projections and valuations prepared by Fluent's Investment Advisors. Sixth, they reviewed and summarized the analysis of Fluent's total liabilities and equity at the date of the acquisition. Seventh, they reviewed financial information relating to the acquisition at October 31, 1993, which marked Novell's first financial year-end after the acquisition.

Eighth, they researched GAAP accounting treatment of research and development costs, as well as software development costs and compared it to Novell's and Fluent's accounting treatment of Fluent's technology assets. Ninth, they analyzed the effect on Fluent's financial position had the proceeds from selling Fluent's technology assets gone into Fluent's treasury. Tenth, they analyzed the consideration given to Fluent's treasury for trademarks it assigned to Novell. Eleventh, they ana-

---

**3.** Pakter is a partner in Russell Novak & Company, LLP.

**4.** This procedure is set out in greater detail on pages 2–3 of the Supplemental Expert Report. (Pl.'s Ex. C.)

lyzed the proxy statement disclosure concerning the ProtoComm litigation and considered whether amounts were reserved or set aside to meet obligations under that litigation. Twelfth, they analyzed Novell's consideration of Fluent's corporate obligations and considered how Fluent shareholder's were treated in terms of their consideration for the acquisition. Thirteenth, they reviewed Novell's October 31, 1993 financial year-end income tax documentation and supporting schedules relating to Fluent's inclusion in Novell's consolidated income tax return. Finally, they used this analysis to present conclusions and opinions for the expert report.

■ Defendants rely on Pakter's deposition testimony in arguing that his opinions lack sound methodology. In fact, this Court could not find a single citation in defendants' brief to Pakter's expert report. Defendants prime argument is that Pakter fails to articulate an accounting or other financial standard by which his opinions were evaluated. My analysis of this contention follows: this case, however, is unique. Simple accounting standards may not explain the full nature of the transaction at issue here. Pakter based his opinions on personal knowledge and experience, as well as a seemingly copious review of a multitude of relevant business documents. He and his firm conducted their own evaluations based on the materials before them and such knowledge and experience. It is not for this Court to decide whether those opinions are in fact accurate, only that they a based on a reliable method. If defendants believe Pakter's testimony to be flimsy, they can challenge his opinions through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . ." *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798. I therefore conclude that plaintiff has shown by a preponderance of the evidence that Pakter employs a reliable method to support his conclusions.

The two key opinions defendants attack are Pakter's conclusion that a liquidation took place and his conclusion that Novell "essentially" bought Fluent's video technology assets. Defendants argue that these intimately related opinions are divorced from the facts. Plaintiff counters that this opinion is based on, *inter alia,* the following. The proxy statement states that, "The merger constitutes a liquidation of the Company [Fluent] under the charter." (Pl.'s Ex. 38 at 2.) The fact that the Bridge Term Sheet specified that bridge loan preferences were conditioned on the "liquidation." (Pl.'s Ex. 44.) The fact that as of August, 1993, Fluent had no employees. (Fluent's Quarterly Tax Returns for September 30, 1993, Pl.'s Ex. 62; Fluent's Quarterly Tax Returns for December 31, 1993, Pl.'s Ex. 63.) Pakter examined the transfer of the patents and trademarks, characterized as the "remaining assets of significance to Novell," which had occurred by in or around May, 1994. (Digital media data stream network management system, patent filed by Novell on Feb. 3, 1993, Pl.'s Ex. 53; assigned on Mar. 10, 1994, Pl.'s Ex. 54; trademarks assigned May 9, 1994, Pl.'s Ex. 55–56.) Novell's consolidated federal income tax return schedule M 1 reduced Fluent to two line items: a $15 million intercompany payable to Novell and a $15 million accumulated deficit. Pakter characterized the schedule as indicating that, "There are no ongoing current assets, current liabilities, revenue streams, employees." (Pakter Dep. at 135, Pl.'s Ex. F.) The 10–K states that, "The transaction was accounted for as a purchase and, on this basis, resulted in a one-time write-off of $20.7 million for purchased research and development in the third quarter of fiscal 1993." (Pl.'s Ex. 47.) The Ernst and Young Report values the technology assets at $21.19 which was, according to the 10 K,

the approximate price of the acquisition. (Pl.'s Ex. 51.)

It appears to this Court that defendants are really arguing that Pakter's opinions are inaccurate in light of the facts. In other words, they focus not on whether the reasoning is valid and the methodology reliable, but rather on whether the conclusions themselves are *correct*. That is not the proper inquiry in a test for admissibility. Again, if defendants believe Pakter's testimony to be feeble, they can challenge his opinions through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . ." *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798. I conclude that Pakter's opinions will assist the trier of fact to understand the evidence or to determine a fact in issue and therefore his testimony meets the "fit" requirement.

In summary, I conclude that Pakter may testify as an expert witness under *Daubert* and its progeny.[5]

### III. Nagy and Levin

Nagy is an investment banker and attorney with more than 34 years of experience with corporate acquisitions. (Nagy Aff. at ¶¶ 3–7, Defs.' Ex. C.) He is an Accredited Senior Member of the American Society of Appraisers, a member of the Pennsylvania bar, and a former Chief Counsel for the Pennsylvania Securities Commission. (Nagy Rebuttal Aff., App. I, Defs.' Ex. D.) As President of Compass Capital Partners, Ltd., he is responsible for valuation of business entities and significant blocks of corporate securities, both public and private, in connections with acquisitions, raising capital, and litigation. (*Id.*) Nagy also advises corporate clients on transactions and structuring financings

involving, *inter alia*, mergers and acquisitions. (*Id.*) At least 20 of the 50 cases in which he testified have involved corporate acquisition or reorganization. (Nagy Reply Aff. at ¶ 2G, Defs.' Ex. E.) Plaintiff claims Nagy's experience is limited to business valuations. Defendants counter that structuring and advisory work are "integral parts of the valuation services." (*Id.*) I find that like Pakter, Nagy possesses "specialized knowledge" which will help the trier of fact determine issues most relevant to this cases: the characterization of complex business transactions and fraudulent conveyances.

Levin is a certified public accountant and certified fraud examiner with over 30 years of experience consulting in the process of accomplishing business combinations and assisting entities when their business combination accounting was questioned by regulators, competitors or class action plaintiffs. (Levin Report at 1, Defs.' Ex. F.) He has provided either trial or deposition testimony in four mergers and acquisitions which involved numerous complex transactions by large companies and required Levin to explain the accounting used in such transactions to corporate counsel and to the staff of the Securities and Exchange Commission. (Levin Report at Ex. B, Defs.' Ex. F; Levin Decl. at ¶ 6, Defs.' Ex. G.) Plaintiff argues that Levin is an accountant who specializes in real estate development and finance and has no experience determining a party's intent. As this Court understands this case, the experts are not being asked to explain a party's subjective intent; rather, they are using their experience to characterize a complex transaction. I find that Ellis also has "specialized knowledge"

---

**5.** I also conclude that defendants have failed to convince this Court that under Federal Rule of Evidence 403, the probative value of

Pakter's testimony will be substantially outweighed by the danger of unfair prejudice, confusion on the issue, or misleading the jury.

above that of a layman with respect to characterizing the type of transaction which occurred.

Nagy made the following opinions with respect to the acquisition which I summarize:

1. Novell purchased Fluent's outstanding stock and such purchase did not and could not adversely impact the rights of Fluent's creditors. As well, such purchase had no effect on Fluent's assets or liabilities.

2. Any action taken to deplete Fluent's assets was the responsibility of Novell, not the Former Fluent Shareholders.

3. If Fluent and Novell are determined to be the same entity, then any liability under fraudulent conveyance theory must analyze the financial conditions of Novell and Fluent on a pro forma basis. On such a basis, the business assets of the combined entities had a value at the time of the closing of Novell's purchase of Fluent's stock well in excess of the ProtoComm judgment.

(Nagy Aff. at ¶ 9, Defs.' Ex. C.) Levin opined the following as I summarize:

1. The merger between Fluent and Novell was "ordinary," "common" and properly accounted for as a "purchase" business combination according to the terms of the agreement and was in compliance with GAAP as attested to by Novell's auditors and its SEC filings.

2. After the merger, Fluent's assets and liabilities were recorded to their fair values, determined in part by a valuation study prepared by Ernst and Young. The valuation complied with GAAP.

3. Fluent was likely in better financial condition after merging with Novell.

(Levin Report at 2, Defs.' Ex. F.)

■ Plaintiff challenges the reliability of both Nagy's and Levin's opinions on the ground that neither expert reviewed any relevant evidence amassed during discovery. Plaintiff argues that Nagy relies only on the pleadings of the case and one deposition. This assessment, however, is a misrepresentation. Nagy, in fact, relied on the 59 exhibits to the one deposition, namely, the deposition of David Bradford ("Bradford"), then General Counsel to Novell. (Nagy Aff. at ¶ 8g, Defs.' Ex. C; Nagy Reply Aff. at ¶ 3A, Defs .' Ex. E.) Those exhibits nearly, if not fully, mirror the exhibits upon which Pakter relied. The documents include, *inter alia,* the merger agreement, the correspondence and memoranda which preceded that agreement, the letters of intent, the Ernst and Young report, the proxy statement, Fluent's tax returns, and the Choate, Hall and Stewart closing letter. Nagy also based his opinions on his years of experience as an investment banker and lawyer. (Nagy Reply Aff. at ¶ 3J, Defs.' Ex. C.) Plaintiff makes similar arguments with respect to what Levin relied upon to reach his conclusions. Defendants respond that Levin actually relied upon the deposition transcripts of Brent Uken, the Ernst and Young witness, Barry Nearhos, the Coopers and Lybrand witness, and Bradford, as well as the exhibits attached thereto. (Levin Report, Ex. A, Defs.' Ex. F.) Levin also employed four accounting principles and standards, including GAAP. (*Id.*)

As with Pakter, I find that both Nagy and Levin based their opinions on their personal knowledge and experience, in addition to an apparent meaningful review of the relevant documents in this unique case. As stated above, the job of this Court is to decide the more narrow question of relia-

bility not the more broad question of accuracy. If plaintiff finds either Nagy's or Levin's opinions shaky, those opinions can be challenged through the conventional means of cross examination and a presentation of contrary evidence. *See Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798. I therefore conclude that defendants have demonstrated by a preponderance of the evidence that Nagy and Levin employ facially reliable methods to support their conclusions.

■ The "fit" analysis for Nagy and Levin echoes that of Pakter. Like defendants' attack on Pakter, plaintiff essentially argues that the opinions of Nagy and Levin are inaccurate in light of the facts. Thus, plaintiff focuses not on the validity of the reasoning and employed methodology, but rather the veracity of the conclusions themselves. Again, as thrice explained, opinions alleged to be weak can be challenged through traditional trial tactics. Just as the documents reviewed by Pakter fit the case here, those same documents can be used by the defense experts. I conclude that both Nagy's and Levin's opinions will assist the trier of fact to understand the evidence or to determine a fact in issue and therefore their testimony meets the "fit" requirement.

In summary, I conclude that both Nagy and Levin may testify at trail.

## III. Conclusion

Plaintiff and defendants have met their burden under the Federal Rules of Evidence as interpreted by *Daubert* and its progeny, and therefore both motions will be denied. Because I will be denying these motions and allowing expert testimony, this Court finds that a hearing is not necessary. Neither party will be substantively prejudiced by this ruling. Both parties placed on the record sufficient information by way of reports, depositions and affidavits for this Court to determine that the experts meet the pretrial standards set forth in *Daubert* and its progeny without the demands of a hearing. Each party must be vigilant at trial. If there are impermissible differences between the proffered expert testimony, the reports and depositions, as usual, appropriate motions or objections are available as protection to the parties.

An appropriate Order follows.

## ORDER

**AND NOW** this 25th day of September, 2001, upon consideration of the motion of defendants Technology for Information and Publishing, L.P., David L. Nelson, Cornelius A. Ferris, and Premkumar Uppaluru to preclude the testimony of Michael Pakter (Document No. 68), and the motion of ProtoComm Corporation to exclude the affidavits and testimony of Gabriel F. Nagy and the Report and Testimony of Ellis L. Levin (Document No. 81), and the responses and replies thereto, and for the reasons set forth in the foregoing memorandum, it is hereby **ORDERED** that:

1. The motion to preclude the testimony of Michael Pakter is **DENIED.**

2. The motion to exclude the affidavits and testimony of Gabriel F. Nagy and the Report and Testimony of Ellis L. Levin is **DENIED.**